UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| LUKE RAMIREZ, <br> *Plaintiff*, <br><br> v. <br><br> THE TOWN OF OXFORD, GEORGE R. TEMPLE, DEPARTMENT OF EMERGENCY SERVICES AND PUBLIC PROTECTION, and DANIEL SEMOSKY, <br> *Defendants*. | No. 3:21-cv-240 (JAM) |

**ORDER GRANTING IN PART AND DENYING IN PART MOTIONS TO DISMISS**

Plaintiff Luke Ramirez is Hispanic and worked as a police officer for the Town of Oxford, Connecticut. He has filed this federal lawsuit stemming from alleged discrimination on the basis of his Hispanic race and his disability. The defendants have moved to dismiss. I will grant their motions except as to Ramirez's claims for disability discrimination and retaliation against the Town and as to his claim for racial discrimination against the Town's chief of police.

**BACKGROUND**

The facts set forth below are drawn from the amended complaint and are assumed to be true only for the purpose of resolving the motions to dismiss.

Ramirez is a Hispanic male of Puerto Rican ancestry.[1] He worked as a police officer for the defendant Town of Oxford.[2] The defendant George Temple was the Town's chief of police and first selectman.[3] The defendant Daniel Semosky was a sergeant for the Connecticut State Police, which is a division of the defendant Connecticut Department of Emergency Services and Public Protection (DESPP).[4] The Town employed members of DESPP such as Semosky to work

---

[1] Doc. #37 at 3 (¶ 4).
[2] *Id*. at 4 (¶ 17).
[3] *Id*. at 3 (¶ 7).
[4] *Id*. at 3-4 (¶¶ 8, 10).

1

with the Town's police department.[5]

In January 2016, Ramirez hurt his back while on duty and was out of work for several months.[6] In 2017, he had back surgery and was out of work for about another six months.[7] Before Ramirez could return to work, Temple required him to undergo a full physical examination, a drug test, blood testing, screening for tuberculosis, a hearing test, and a pulmonary test.[8] None of these tests related to Ramirez's back, and no other officer had to undergo testing unrelated to a medical condition prior to being allowed to return to work.[9] Such testing violates the collective bargaining agreement between the Town and its police officers.[10]

In November 2018, Ramirez's back condition flared up, and he again took off time from work.[11] The Town's finance director, Jim Hilva, informed Ramirez that he would receive reduced pay and encouraged him to apply for 90% disability, which would effectively terminate his employment as a police officer.[12] Hilva then discontinued Ramirez's monthly stipend allowance which he had received for declining insurance coverage through the Town.[13]

In February 2019, Ramirez complained in writing to Hilva about being treated unfairly following his back injury.[14] Hilva forwarded Ramirez's complaint to Temple, who took no action.[15] For his part, Hilva claimed that the suspension of Ramirez's stipend payments was a clerical error.[16] But a Town bookkeeper told Ramirez that Hilva had instructed that his stipend

---

[5] *Id.* at 3 (¶ 9).
[6] *Id.* at 5 (¶ 23).
[7] *Ibid.* (¶ 24).
[8] *Id.* at 6 (¶ 25).
[9] *Ibid.* (¶¶ 26-27).
[10] *Ibid.* (¶ 28).
[11] *Id.* at 7 (¶ 30).
[12] *Ibid.* (¶ 31).
[13] *Ibid.* (¶ 32).
[14] *Id.* at 7-8 (¶ 33).
[15] *Id.* at 8 (¶ 34).
[16] *Ibid.* (¶ 36).

not be paid and described Hilva's conduct as "underhanded."[17] Ramirez complained that he was "being treated unfairly" and that the defendants were making his return to work "very hard" for him.[18]

About a week later, Ramirez's physician cleared him to return to full duty.[19] But when Ramirez sought to be recertified as a police officer, Semosky refused to schedule the recertification without approval from Temple.[20] When Ramirez presented written authorization clearing him for return to work, Semosky told him that, per Temple's orders, Ramirez would have to undergo an exam first.[21] Ramirez told Semosky that he would be filing a formal complaint about the extended process of returning to work and his resulting loss of overtime.[22]

Hilva then informed Ramirez that he would have to undergo a physical and psychological examination before returning to work.[23] Hilva told Ramirez that Semosky would schedule the exams, while Semosky told Ramirez that Temple would have to schedule them.[24] Ramirez again complained in writing, stating that by constantly "adding conditions" Temple and Semosky were effectively placing him on an "unpaid suspension."[25]

In April 2019, Ramirez underwent a full physical, drug testing, blood testing, a screening for tuberculosis, a hearing test, and a pulmonary test at Griffin Hospital, as well as a comprehensive fitness-for-duty evaluation.[26] Only one other injured officer, Peter Hopson, was subject to this fitness-for-duty test.[27] A third injured officer—of similar rank, experience,

---

[17] *Ibid*. (¶¶ 35-38).
[18] *Ibid*. (¶ 37).
[19] *Ibid*. (¶ 39).
[20] *Id*. at 8-9 (¶¶ 40-41).
[21] *Id*. at 9-10 (¶¶ 45-48).
[22] *Id*. at 10 (¶ 49).
[23] *Id*. at 11 (¶ 50).
[24] *Ibid*. (¶¶ 50-51).
[25] *Ibid*. (¶ 52).
[26] *Ibid*. (¶¶ 53-54).
[27] *Id*. at 11-12 (¶¶ 54-55).

training, and position—was not required to take the fitness-for-duty test after he was injured on the job and cleared for return by his physician.[28] This officer, unlike Ramirez and Hopson, had not complained about being subject to discrimination after facing an injury.[29]

Ramirez then presented confirmation of his results and clearance from his physician to the Town.[30] But Temple required him to take recertification classes before returning to work, even though his certification was not scheduled to expire until June 30, 2019.[31] Ramirez had been requesting recertification since February, but the defendants ignored his requests while allowing other officers to attend recertification classes.[32] Even before his certification expired, Ramirez was placed on administrative leave while he took recertification classes, whereas other officers taking recertification classes were permitted to work and were not placed on leave.[33]

In May 2019, Ramirez again complained to the Town about the way he was treated related to his injuries, his return to work, and the refusal to return him to full duty.[34] Two days later, Ramirez was returned to full duty.[35] In response to Ramirez's frustrations and to protect other injured officers returning to duty from overly burdensome medical testing, the Town signed a memorandum of understanding stating that it would limit fitness-for-duty examinations to the illness or injury that caused an officer to be out of work.[36]

In August 2019, Ramirez, Hopson, and a third officer were issued ammunition for use on the practice range and stored it in the usual manner.[37] But Ramirez and Hopson were

---

[28] *Id*. at 12 (¶ 56).
[29] *Ibid*.
[30] *Id*. at 13 (¶¶ 58-59).
[31] *Ibid*. (¶ 61).
[32] *Ibid*. (¶ 62).
[33] *Id*. at 14 (¶¶ 64-65).
[34] *Ibid*. (¶ 66).
[35] *Ibid*. (¶ 67).
[36] *Id*. at 12-13 (¶ 57).
[37] *Id*. at 15 (¶ 69).

subsequently disciplined for improper storage of ammunition.[38] Unlike Ramirez and Hopson, the third officer—who was not disciplined—had not complained about the fitness-for-duty evaluation.[39]

In October 2019, Temple saw Ramirez and another Hispanic officer working at a high school football game. Temple asked them, "What is this, Hispanic night?"[40] Temple also made other unspecified comments which upset Ramirez and caused a witness to ask what Temple meant by those comments.[41]

On February 19, 2020, Ramirez was placed on administrative leave while DESPP conducted a criminal investigation into his conduct.[42] Ramirez alleges that Temple caused the investigation "to harass, retaliate against and to cause further harm" to him.[43]

On February 20, 2020, Ramirez filed a complaint with the Connecticut Commission on Human Rights and Opportunities (CHRO) against Oxford and DESPP alleging discrimination on the basis of race and disability.[44] The defendants received notice of the complaint on March 3, 2020.[45]

In July 2020, a Connecticut court found that the DESPP criminal investigation did not result in probable cause to arrest Ramirez.[46] Nonetheless, DESPP then conducted an internal affairs investigation against Ramirez based on the same conduct.[47] The investigation against Ramirez ultimately found the charges to be "Unsubstantiated."[48] Ramirez was kept on

---

[38] *Ibid.* (¶¶ 69-70).
[39] *Ibid.* (¶ 70).
[40] *Id.* at 18 (¶ 82).
[41] *Ibid.*
[42] *Id.* at 14 (¶¶ 72, 74).
[43] *Id.* at 16 (¶¶ 72-73).
[44] Doc. #47-3 at 4-11 (CHRO affidavit).
[45] *Id.* at 1-2, Doc. #48-2 at 1-2.
[46] Doc. #37 at 16 (¶ 75).
[47] *Id.* at 17 (¶ 77).
[48] *Ibid.* (¶ 80).

administrative leave during the investigation, while another officer under internal investigation (which was ultimately sustained) was permitted to continue working.[49]

Notwithstanding these findings by the state court and DESPP in Ramirez's favor, Temple refused to immediately return Ramirez to work and instead commenced his own investigation into the same conduct.[50] No formal procedure for such an investigation exists, and no other officer has ever been so investigated.[51] When asked about his authority to conduct such an investigation, "Temple was utterly unable to cite to any authority, rule, directive, procedure or previous instance of such an 'Investigation' whatsoever."[52]

The amended complaint alleges seven claims. Count One alleges that the Town engaged in racial discrimination in violation of Title VII of the Civil Rights Act of 1964 (Title VII), 42 U.S.C. §§ 2000e *et seq*. Count Two alleges that the Town engaged in disability discrimination in violation of the Americans with Disabilities Act of 1990 (ADA), 42 U.S.C. §§ 12101 *et seq*., and the Rehabilitation Act of 1973, 29 U.S.C. §§ 794 *et seq*. Count Three alleges pursuant to 42 U.S.C. § 1983 that Temple and Semosky violated Ramirez's constitutional right to equal protection. Count Four alleges that the Town and DESPP violated the Connecticut Fair Employment Practices Act (CFEPA), Conn. Gen. Stat. § 46a-60. Count Five alleges that the defendants engaged in negligent supervision in violation of state law. Count Six alleges that Temple and Semosky intentionally inflicted emotional distress on Ramirez. Count Seven alleges a *Monell* claim for § 1983 liability against the Town.

But based on the limited number of issues addressed in Ramirez's briefing in response to the motions to dismiss and my colloquy with counsel at oral argument, Ramirez has abandoned

---

[49] *Id*. at 16-17 (¶¶ 76, 79).
[50] *Id*. at 17-18 (¶ 81).
[51] *Id*. at 18 (¶ 81).
[52] *Ibid*.

or withdrawn most of his claims. The only remaining claims in dispute are Count Two (alleging tripartite claims under Title VII for disability-based discrimination, retaliation, and a hostile work environment against the Town), Count Three (alleging equal protection claims against Temple and Semosky), and Count Six (alleging intentional infliction of emotional distress claims against Temple and Semosky).

## DISCUSSION

When considering a motion to dismiss under Rule 12(b)(6), a court must credit as true all factual matters alleged in a complaint, although a complaint may not survive unless the facts it recites are enough to state plausible grounds for relief. *See, e.g., Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). As the Supreme Court has explained, this "plausibility" requirement is "not akin to a probability requirement," but it "asks for more than a sheer possibility that a defendant has acted unlawfully." *Ibid.* Thus, "[w]here a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Ibid.*

Moreover, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions," and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" to establish a plausible claim for relief. *Ibid.* In this manner, the Supreme Court has instructed that a court's focus must be on whether the well-pleaded factual allegations—as distinct from conclusory statements—are enough to establish plausible grounds for relief. *Id.* at 679. This is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Ibid.*; *see also Vengalattore v. Cornell Univ.*, 36 F.4th 87, 102 (2d Cir. 2022) (discussing applicable principles for review of the adequacy of a complaint).

### *Disability discrimination (Count Two)*

Count Two alleges that the Town engaged in disability discrimination in violation of the ADA and the Rehabilitation Act. These two federal statutes provide essentially equivalent protections against disability discrimination. *See Williams v. MTA Bus Co.*, -- F.4th --, 2022 WL 3330099, at *6 (2d Cir. 2022); *Natofsky v. City of New York*, 921 F.3d 337, 345 (2d Cir. 2019). In the employment context, the ADA and Rehabilitation Act require a plaintiff to show that he was disabled or perceived to be disabled, that he was qualified to perform the job in question with or without a reasonable accommodation, and that he suffered an adverse employment action because of his disability. *See Gentleman v. State Univ. of New York Stony Brook*, 2022 WL 1447381, at *3 (2d Cir. 2022).[53]

The defendants argue that Ramirez has failed to plausibly allege that he suffered an adverse employment action because of his disability. "To qualify as an adverse employment action, the employer's action toward the plaintiff must be materially adverse with respect to the terms and conditions of employment," in a manner that is "more disruptive than a mere inconvenience or an alteration of job responsibilities." *Davis v. New York City Dept. of Educ.*, 804 F.3d 231, 235 (2d Cir. 2015). Examples of "materially adverse" actions include "a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, [or] significantly diminished material responsibilities." *Galabya v. New York City Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir. 2000).

---

[53] Because these two statutes provide equivalent protections and have been combined into a single claim for relief (Count Two), I need not address at this time the defendants' argument that certain acts did not occur within 300 days of the filing of Ramirez's CHRO complaint and therefore are time-barred under the ADA. Such evidence would still be proper in support of Ramirez's parallel claim under the Rehabilitation Act, which is not subject to a CHRO administrative exhaustion requirement. *See Costabile v. New York City Health and Hosp. Corp.*, 951 F.3d 77, 81–82 (2d Cir. 2020) (*per curiam*). If at some later point in the litigation the defendants can show that there is a genuine need for me to resolve their argument with respect to the 300-day rule for an ADA claim, they may raise the issue anew.

The parties' dispute centers on whether the Town's fitness-for-duty testing requirements amounted to a materially adverse action. Ordinarily, a fitness-for-duty test does not qualify as an adverse employment action. *See Farina v. Branford Bd. of Educ.*, 458 F. App'x 13, 17 (2d Cir. 2011); *Pardo v. Nielsen*, 2021 WL 1143897, at *12 (S.D.N.Y. 2021). On the other hand, fitness-for-duty testing requirements may amount to an adverse action if the evidence shows that the testing has been manipulated by the employer to depart from standard testing requirements and to deter the employee from returning to service. *See Larsen v. Berlin Bd. of Educ.*, 2022 WL 596677, at *6 (D. Conn. 2022) (citing cases).

Here, Ramirez has alleged that he was subjected to testing requirements well beyond the ordinary. He claims that the Town singled him out by requiring him to pass various medical tests unrelated to his back injury in a manner not required of any other injured officer, leading to a three-month delay in his return to work from February to May 2019. Further, Ramirez has alleged that the testing, investigations, and delay embarrassed him and caused him to lose income and career advancement opportunities. This is enough for initial pleading purposes to plausibly allege an adverse employment action. *See Lewis v. Boehringer Ingelheim Pharms., Inc.*, 79 F. Supp. 3d 394, 406 (D. Conn. 2015) (delay in returning employee to work from paid disability leave is materially adverse where the leave is "unnecessarily prolonged" and causes "economic and emotional damages"); *Baker v. Connecticut*, 2006 WL 581205, at *8 (D. Conn. 2006) (administrative leave lasting roughly four months "could constitute an adverse employment action because it involved significantly diminished material responsibilities over a significant period of time, such that it could be very disruptive to [the plaintiff's] career").

Because the complaint plausibly alleges that the fitness-for-duty tests constituted adverse actions, I need not consider or address the validity of all the alleged adverse actions at this time.

9

Accordingly, I will deny the Town's motion to dismiss the claim for disability discrimination as alleged in Count Two.

### *Disability retaliation (Count Two)*

Count Two further alleges that the Town engaged in disability retaliation in violation of the ADA and the Rehabilitation Act. "The elements of a retaliation claim under either the Rehabilitation Act or the ADA are (i) a plaintiff was engaged in protected activity [such as lodging a complaint about disability discrimination]; (ii) the alleged retaliator knew that plaintiff was involved in protected activity; (iii) an adverse decision or course of action was taken against plaintiff; and (iv) a causal connection exists between the protected activity and the adverse action." *Natofsky*, 921 F.3d at 353.

The Town argues that the amended complaint fails to allege that Ramirez engaged in the protected activity of complaining about disability discrimination. I do not agree. Beginning in February 2019, Ramirez submitted a written complaint to Hilva, which was forwarded to Temple, stating "I don't feel as I am being treated fairly ever since I injured my back" and requesting that Oxford treat him "without judgment or prejudice."[54] Shortly thereafter, Ramirez submitted another written complaint to Oxford objecting to the way Temple and Semosky "keep adding conditions" that were "driving [him] crazy" and leaving him "not sure what to do."[55] Finally, in May 2019 Ramirez submitted a third written complaint to the effect that "he was being treated differently in the manner in which he was treated related to his injuries, his return to work and defendants' refusal to return him to full duty."[56]

Ramirez's repeated complaints sufficed to put the Town on notice that he was objecting

---

[54] Doc. #37 at 7-8 (¶ 33).
[55] *Id*. at 11 (¶ 52).
[56] *Id*. at 14 (¶ 66).

to unfair treatment related to his back injury and also objecting to the gauntlet of administrative obstacles he faced when attempting to return to work. The complaint adequately alleges that Ramirez engaged in recognizably protected activity by complaining to the Town about disability discrimination.

The Town next argues that the amended complaint fails to allege a causal connection between Ramirez's protected activity and any adverse action. I do not agree. The amended complaint alleges that Temple imposed the heightened testing requirements in February 2019 after Ramirez complained to Hilva about being treated unfairly following his back injury.[57] Ramirez further claims that the "only other officer to have been subjected to the fit for duty test is another injured officer of the defendant, Peter Hopson, who is suffering similar mistreatment by the same defendants and similarly has taken legal action."[58] By contrast, a third officer who was similarly situated in rank, experience, and training was subjected to "solely an evaluation of the specific injury prior to returning to work," where the only "material difference between this officer and the plaintiff and Hopson is that this Officer did not complain to the defendants that their conduct constituted unlawful discrimination and harassment based upon disability or perceived disability."[59] Similarly, Ramirez alleges that only he and Hopson faced discipline in February 2020 related to ammunition storage, whereas Oxford did not discipline a third officer who had stored ammunition in the same manner but who had not "been vocal" in complaining about "the sweeping Fit for Duty evaluation and the unrelated examinations to return to work."[60]

A causal connection can be shown "indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as

---

[57] *Id*. at 9-10 (¶¶ 45-46).
[58] *Id*. at 12 (¶ 55).
[59] *Ibid*. (¶ 56).
[60] *Id*. at 15 (¶ 70).

disparate treatment of fellow employees who engaged in similar conduct." *Natofsky*, 921 F.3d at 353. Taken together, the allegations in the amended complaint suffice to plausibly establish the required causal connection between Ramirez's protected complaints about disability discrimination and the later adverse actions. Accordingly, Ramirez has plausibly alleged a disability retaliation claim.

### *Hostile work environment (Count Two)*

Count Two further alleges a disability-based hostile work environment claim. Such a claim requires a plaintiff to show that, because of his disability, he was forced to endure harassment that was so severe and pervasive that it created an abusive working environment and that this abusive environment was in turn attributable to the defendant employer. *See Fox v. Costco Wholesale Corp.*, 918 F.3d 65, 74 (2d Cir. 2019).

Ramirez has not plausibly alleged a disability-based hostile working environment. Indeed, his primary complaint is that he was *not* allowed to return to work because of the Town's disability-based bias against him. If an employee is not even present in the workplace, he can hardly complain that the work environment is hostile. To the extent that Ramirez complains about how he was treated after he returned to work (such as being subject to investigation for his storage of ammunition), he does not allege facts to plausibly show that he was subject to harassment so severe and pervasive that it created an abusive working environment. To the extent that Ramirez complains about Temple's race-based comment about him being Hispanic, this comment had nothing to do with Ramirez's disability. Accordingly, Ramirez has not plausibly alleged a claim for a disability-based hostile workplace environment.

### *Equal protection (Count Three)*

Ramirez alleges pursuant to 42 U.S.C. § 1983 that Temple and Semosky violated his

constitutional right to equal protection by treating him differently from other police officers. "The Equal Protection Clause ... commands that no State shall deny to any person within its jurisdiction the equal protection of the laws, which is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985).

The Equal Protection Clause does not entitle a plaintiff to relief merely because he has been treated differently than someone else. Instead, "[t]o prevail on an equal protection claim, a plaintiff must demonstrate that he was treated differently than others similarly situated as a result of intentional or purposeful discrimination." *Reynolds v. Quiros*, 990 F.3d 286, 300 (2d Cir. 2021).

The courts have recognized different variants of equal protection claims. These variants include what are known as "selective enforcement" and "class of one" claims. *See Hu v. City of New York*, 927 F.3d 81, 91–96 (2d Cir. 2019) (extensive discussion). The Supreme Court, however, has ruled that a plaintiff may not pursue a class-of-one claim in the public employment context. *See Engquist v. Oregon Dep't of Agriculture,* 553 U.S. 591 (2008); *Hu*, 927 F.3d at 95. Accordingly, Ramirez's equal protection claim against Temple and Semosky must proceed—if at all—as a selective-enforcement claim.

For a selective-enforcement claim, a plaintiff may complain that she was victimized because she belongs to a protected class or because of her choice to exercise a fundamental right. *See Hu*, 927 F.3d at 91 (citing *LeClair v. Saunders*, 627 F.2d 606, 609–10 (2d Cir. 1980)). Alternatively, a plaintiff may complain simply that the law was selectively enforced by reason of malice—that is, "because of a defendant's personal malice or ill will toward a plaintiff." *Ibid.*

As to Temple, the complaint alleges that Temple discriminated against Ramirez because

13

he was Hispanic, which of course is a protected class for purposes of a claim under the Equal Protection Clause. *See Massachusetts Bd. of Ret. v. Murgia*, 427 U.S. 307, 314–17 (1976) (describing tiers of equal protection scrutiny). Ramirez further alleges that Temple made an offensive remark to him about being Hispanic when they saw each other at a high school football game in October 2019. And the amended complaint otherwise alleges that Temple was primarily responsible for the alleged adverse employment actions against Ramirez.[61] All this is enough for initial pleading purposes to plausibly support Ramirez's race-based equal protection claim against Temple.

As to both Temple and Semosky, the complaint further alleges that they discriminated against Ramirez because of his disability. But disability is not a suspect or protected classification for equal protection purposes. *See Barrett-Browning v. Connecticut Dep't of Correction*, 2019 WL 3412173, at *6 (D. Conn. 2019) (citing *Bd. of Trustees of Univ. of Alabama v. Garrett*, 531 U.S. 356, 367–68 (2001)). Thus, if Ramirez's disability-based equal protection claim is to proceed, it must be based on the theory that Temple and Semosky acted with malice against Ramirez. And this in turn raises the question whether a plaintiff may pursue a malice-based selective-enforcement claim in the public employment context.

As noted above, the Supreme Court in *Engquist* has ruled that a plaintiff may not pursue a class-of-one equal protection claim in the public employment context. It reasoned that when the government acts as an employer it has discretion in ways that it does not ordinarily have

---

[61] I previously dismissed Ramirez's Title VII and Equal Protection claims against Temple because the initial complaint had not alleged that "this comment or Temple's involvement more generally had anything to do with" the issues Ramirez faced in returning to work, and in particular "any of the adverse actions against him." *Ramirez v. Town of Oxford*, 2021 WL 5889161, at *4–5 (D. Conn. 2021). By contrast, the amended complaint consistently identifies Temple as the town official directly responsible for subjecting Ramirez to the fitness-for-duty tests, recertification requirements, psychological examination, drug testing and tuberculosis screening, and discipline for routine ammunition storage, as well as the criminal investigation, internal affairs investigation, and finally Temple's own investigation. *See* Doc. #37 at 6, 9-18 (¶¶ 37, 41, 47, 51, 53-54, 61, 65, 69-72, 77, 79, 81).

14

when acting as a regulatory sovereign. *See* 553 U.S. at 601–09. Thus, the Supreme Court ruled that "the class-of-one theory of equal protection—which presupposes that like individuals should be treated alike, and that to treat them differently is to classify them in a way that must survive at least rationality review—is simply a poor fit in the public employment context," because "treat[ing] employees differently is not to classify them in a way that raises equal protection concerns" but rather "to exercise the broad discretion that typically characterizes the employer-employee relationship." *Id*. at 605.

The Court in *Engquist* also stated that it was "guided" by "the common-sense realization that government offices could not function if every employment decision became a constitutional matter" and the "possibility that any personnel action in which a wronged employee can conjure up a claim of differential treatment will suddenly become the basis for a federal constitutional claim." *Id.* at 607, 608. "Indeed, an allegation of arbitrary differential treatment could be made in nearly every instance of an assertedly wrongful employment action—not only hiring and firing decisions, but any personnel action, such as promotion, salary, or work assignments—on the theory that other employees were not treated wrongfully." *Id.* at 608.

Does *Engquist* preclude not only a public employee's class-of-one claim based on allegations of *arbitrary* adverse action but also a selective-enforcement claim based on allegations of *malicious* adverse action? The Second Circuit has flagged this question but has yet to decide it. *See Hu*, 927 F.3d at 100 n.5. Meanwhile, district courts within the Second Circuit are divided. *Compare, e.g.*, *Airday v. City of New York*, 2020 WL 4015770 (S.D.N.Y. 2020) (allowing claim for malice-based selective enforcement in public employment context), *with Heusser v. Hale*, 777 F. Supp. 2d 366, 386–87 (D. Conn. 2011) (not allowing claim for malice-based selective enforcement in public employment context).

In my view, the holding and result in *Engquist* compel the conclusion that malice-based equal protection claims may not proceed in the public employment context. At issue in *Engquist* was a jury verdict finding that the plaintiff, Anup Engquist, was subject to adverse action "for arbitrary, *vindictive or malicious reasons*." 553 U.S. at 596 (emphasis added). On appeal, the Ninth Circuit defined the class-of-one theory to include actions that are "arbitrary, irrational, *or malicious*." *Engquist v. Oregon Dep't of Agric.*, 478 F.3d 985, 993 (9th Cir. 2007) (emphasis added). The Ninth Circuit went on to reverse the jury verdict, concluding in part that "[a]pplying equal protection to forbid arbitrary *or malicious* firings of public employees would completely invalidate the practice of public at-will employment." *Id.* at 995 (emphasis added). It held in relevant part that "[w]e reverse the judgment on the constitutional claims because the equal protection claim is invalid as a matter of law." *Id.* at 1010.[62]

The Supreme Court affirmed the Ninth Circuit's reversal of the district court judgment. *See* 553 U.S. at 609. But if it were true that a public employee could maintain an equal protection claim based on *malicious* adverse action—as distinct from merely *arbitrary* adverse action—then the Ninth Circuit would have vacated the judgment and remanded for re-trial on the issue of whether the defendants acted with malice (or whether the jury verdict could be sustained on malice grounds alone), rather than outright reversing the equal protection verdict as invalid as a matter of law. More to the point, the Supreme Court would not have affirmed the Ninth Circuit's judgment—and done so without any suggestion that a malice-based claim could proceed.[63]

---

[62] The jury not only found that the defendants had acted "for arbitrary, vindictive or malicious reasons," but it also awarded $125,000 in punitive damages on the equal protection claim which the Ninth Circuit likewise ruled "cannot stand." 478 F.3d at 992, 999; *see also id.* at 1014 (Reinhardt, J., dissenting) (noting that "Engquist presented her case on the theory that Szczepanski and Hyatt were acting out of malice" and that "Engquist has demonstrated that she was singled out to be the target of government malice and that this malice was the cause of her termination").

[63] Subsequent case history shows that the case was remanded to the district court solely to amend the judgment with respect to damages and costs to be awarded for a companion state law claim on which the jury also rendered a plaintiff's verdict. *See Engquist v. Oregon Dep't of Agric.*, 2009 WL 497996, at *1 (D. Or. 2009), as amended (Mar. 10, 2009).

To be sure, the Supreme Court's discussion in *Engquist* does not tease out the distinction between class-of-one claims based on evidence of mere arbitrariness as opposed to outright malice. And I largely agree with Judge Caproni's well-stated reasons why the rationale in *Engquist* applies with less force to malice-based equal protection claims than it does to arbitrary-based equal protection claims. *See Airday v. City of New York*, 2020 WL 4015770, at *4–6.

Still, the principle of *stare decisis* compels a lower court to follow the judgments of the Supreme Court and not just their reasoning. The doctrine of "[v]ertical *stare decisis* applies to Supreme Court precedent in two ways. First, the *result* in a given Supreme Court case binds all lower courts. Second, the *reasoning* of a Supreme Court case also binds lower courts." *United States v. Duvall*, 740 F.3d 604, 609 (D.C. Cir. 2013) (Kavanaugh, J., concurring in the denial of reh'g *en banc*). "Because vertical *stare decisis* is an absolute command, *see* Amy Coney Barrett, *Precedent and Jurisprudential Disagreement*, 91 Tex. L. Rev. 1711, 1713 (2013), this [district] court is forbidden from revisiting a higher court's binding holding, no matter how little sense a bound party—or this court—may think the applicable rule of law makes." *In re Am. Express Anti-Steering Rules Antitrust Litig.*, 361 F. Supp. 3d 324, 340 n.10 (E.D.N.Y. 2019).

In view of the record before the Supreme Court and its judgment in *Engquist*, I am convinced that the Supreme Court necessarily concluded that a malice-based equal protection claim could not proceed in the public employment context. Accordingly, I will grant the defendants' motion to dismiss Ramirez's equal protection claim insofar as it rests on a claim of malice-based discrimination.[64]

### *Intentional infliction of emotional distress (Count Six)*

Ramirez has also sued Temple and Semoksy for intentionally causing him emotional

---

[64] In light of this conclusion, there is no need for me to address the parties' arguments about whether Ramirez has alleged sufficient comparators to sustain an equal protection claim.

distress. Under Connecticut law, a plaintiff seeking damages for intentional infliction of emotional distress must establish "(1) that the actor intended to inflict emotional distress or that he knew or should have known that emotional distress was the likely result of his conduct; (2) that the conduct was extreme and outrageous; (3) that the defendant's conduct was the cause of the plaintiff's distress; and (4) that the emotional distress sustained by the plaintiff was severe." *Perez-Dickson v. City of Bridgeport*, 304 Conn. 483, 526–27 (2012). The Connecticut Supreme Court has explained that "extreme and outrageous" conduct describes a narrow set of behavior which "exceeds all bounds usually tolerated by decent society" and is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Id*. at 527 (quoting *Appleton v. Bd. of Educ. of Town of Stonington,* 254 Conn. 205, 210–11 (2000)).

Ramirez's allegations against Temple and Semosky fall short of the "extreme and outrageous" behavior required to sustain a claim for intentional infliction of emotional distress. The most serious allegations are those against Temple for contriving overburdensome testing requirements that kept Ramirez in limbo after his back injury and then retaliating against him for complaining about such testing by instigating multiple baseless investigations into his conduct. But in "the employment context, it is the employer's conduct, not the motive behind the conduct, that must be extreme or outrageous," such that an "adverse yet routine employment action, even if improperly motivated, does not constitute extreme and outrageous behavior when the employer does not conduct that action in an egregious and oppressive manner." *Miner v. Town of Cheshire*, 126 F. Supp. 2d 184, 195 (D. Conn. 2000). Even conduct that is clearly wrong and illegal, such as paying an employee less on the basis of race or gender, does not give rise to liability for infliction of emotional distress unless the defendant acts in an especially humiliating,

18

extreme, or outrageous manner. *See ibid*.

Here, Ramirez has not alleged that Temple took any additional actions to humiliate him beyond making the decisions to impose post-injury fitness testing and to commence the three investigations into his conduct. The only personal antagonism Ramirez alleges involving Temple is his race-related comment at the football game, which was improper but not extreme and outrageous under Connecticut law. With respect to Semosky, Ramirez does not allege that Semosky took independent action to injure him as opposed to merely following Temple's orders. I will therefore dismiss Ramirez's claim for intentional infliction of emotional distress against Temple and Semosky.

## CONCLUSION

For the reasons stated above, the Court GRANTS in its entirety the motion to dismiss of DESPP and Semosky (Doc. #47). The Court otherwise GRANTS in part and DENIES in part the motion to dismiss of the Town and Temple (Doc. #48). All claims against the Town and Temple are dismissed except the ADA and Rehabilitation Act claims for disability-based discrimination and retaliation against the Town (Count Two) and the § 1983 equal protection claim for racial discrimination against Temple (Count Three).

It is so ordered.

Dated at New Haven this 24th day of August 2022.

/s/ *Jeffrey Alker Meyer*
Jeffrey Alker Meyer
United States District Judge